# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

LISA MICHELLE HARMON,

      **Plaintiff,**

      **v.**                                   **Case No. 18-CV-74**

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS
DISTRICT 10 AFL-CIO UNION LODGE # 66,

      **Defendant.**

---

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Lisa Michelle Harmon files this lawsuit without the assistance of counsel against her former union, International Association of Machinists and Aerospace Workers District 10 AFL-CIO Union Lodge #66 ("the Union"). (Amended Complaint, Docket # 5.) Harmon alleges that the Union breached its duty of fair representation with respect to certain grievances with Harmon's former employer, the Wisconsin Regional Training Partnership ("WRTP"). The Union has moved for summary judgment. (Defendant's Motion for Summary Judgment, Docket # 39.) For the reasons explained below, the Union's motion for summary judgment is granted.

## UNDISPUTED FACTS

Harmon has submitted a Response and Objections to Defendant's Proposed Findings of Fact ("PRDPFOF") (Docket # 50), and her own Proposed Findings of Fact ("PPFOF") (Docket # 52). She attempts to support her facts and her responses to the Union's facts with

documentary evidence she apparently compiled while working at WRTP (*see* Docket # 52-1 & 52-2), and audio tapes she secretly recorded of conversations with Union members and WRTP employees (*see* Exhibit 1 to PPFOF (**available in hard copy only**)). The Union objects to this evidence on hearsay and authentication grounds.

Some of Harmon's documents appear to violate the rule against hearsay, *see* Fed. R. Evid. 802, and Harmon has not proffered how they would be admissible at trial. As to the audio tapes, for each recording Harmon has described when the conversation allegedly took place and who was present. (*See* Exhibit H to PPFOF, Docket # 52-1 at 112–16.) Her proposed findings of fact contain timestamps for particular conversations and generally state the identity of the alleged speaker(s). Harmon also has submitted an affidavit affirming that she is "competent to testify on the matters stated" in response to the Union's summary-judgment motion. (Affidavit of Lisa Michelle Harmon ¶ 1, Docket # 51.) Thus, while Harmon may not have complied with the technical requirements of authentication, *see* Fed. R. Evid. 901, it appears she may be able to authenticate the audio tapes herself. Assuming Harmon could establish authenticity, many of the conversations arguably would be admissible as party admissions. *See* Fed. R. Evid. 801(d)(2). Accordingly, I will take the Union's Proposed Findings of Fact ("DPFOF") (Docket # 41) as uncontested only where it is clear Harmon has failed to contradict those factual assertions with admissible evidence.

### 1. Background

Wisconsin Regional Training Partnership assists individuals to secure employment in the construction and manufacturing sectors by conducting orientations, providing training, identifying employment opportunities, and providing other services. (DPFOF ¶ 2.) WRTP

secures funding for its programs and services through partner agencies such as "Employ Milwaukee," which administer various state and federal funding programs, including the federal Workforce Innovation and Opportunity Act ("WIOA"). (*Id.* ¶ 12.) The funding WRTP receives from its programs and services is transmitted through "vouchers" from partner agencies. (*Id.* ¶ 14.) WRTP conducts an orientation (the "BIGSTEP Orientation") designed for individuals considering its programs. (*Id.* ¶ 13.)

International Association of Machinists and Aerospace Workers, District 10 AFL-CIO Local Lodge 66 is a labor union whose members occupy a wide range of jobs, from skilled labor (such as machinists, tool and die makers, and flight simulator technicians) to case managers. (*Id.* ¶ 1.) At all relevant times, WRTP and the Union were subject to a Collective Bargaining Agreement ("the Agreement") that included, among other provisions: Non-Discrimination, Sick/Personal Days, Unpaid Leaves of Absence, Grievance Procedure, and Discharge and Discipline. (PPFOF ¶ 4; DPFOF ¶ 4.) Patrick O'Connor was the Union's Business Agent. (DPFOF ¶ 6.) The Union's Committeepersons at WRTP were Candace Seib, Joe Nicosia, and Kyle Ashley. (*Id.* ¶ 7.)

On or about November 9, 2016, WRTP hired Harmon as a Construction Training Program Case Manager. (PPFOF ¶¶ 1–2.) As Case Manager, Harmon's primary responsibilities included ascertaining whether individual BIGSTEP orientation attendees met eligibility requirements for enrollment into funding programs, enrolling eligible individuals in funding programs such as WIOA, completing vouchers for eligible individuals, and following up with eligible individuals as needed. (DPFOF ¶ 15.) Her immediate supervisor was Tracey

Griffith. (*Id.* ¶ 10.) Harmon became a member of the Union thirty-one days after her employment began. (*Id.* ¶ 5; PPFOF ¶ 3.)

2. *Harmon's January 2017 Complaints*

In January 2017, Harmon reported overhearing Griffith make a racial comment regarding another individual and complained of unfair treatment by Griffith (the "January 2017 Complaints"). (DPFOF ¶ 16.) Upon learning of Harmon's complaints, the Union decided it needed to take immediate action. (*Id.* ¶ 17.) To that end, on January 9, 2017—the same day she first learned of Harmon's complaints—Seib spoke with Mark Kessenich, WRTP's President and Chief Executive Officer, and arranged a meeting to allow Harmon an opportunity to explain her complaints to Kessenich personally. (*Id.* ¶¶ 9, 17–18.) During the meeting, Kessenich assured that Harmon's employment was not in jeopardy, he took Harmon's complaints seriously, and the alleged conduct had no place at WRTP. (*Id.* ¶ 19.) Kessenich also committed to personally investigate Harmon's complaints. (*Id.*) The following day, Kessenich told Seib that he had discussed the allegations with Griffith. (*Id.* ¶ 20.) Kessenich indicated that Griffith denied making the racial comment Harmon described, treating Harmon differently than her co-workers, and Harmon's other allegations.

On January 11, 2017, Harmon informed the Union via email that she wanted to file a formal complaint against Griffith. (*Id.* ¶ 21; Exhibit E to PPFOF, Docket # 52-1 at 103–04.) Seib acknowledged that the Union was aware of Harmon's complaint and instructed Harmon to also file her complaint with Matthew Waltz, WRTP's Director of Administration and one of Harmon's managers. (PPFOF Ex. E, Docket # 52-1 at 103–06; DPFOF ¶ 8.) Later that day, O'Connor, Seib, Ashley, and Nicosia met with Kessenich and Waltz to discuss

Harmon's allegations. (DPFOF ¶ 22.) During the meeting, WRTP agreed to the Union's request that WRTP thoroughly investigate Harmon's complaints, including the alleged racial comment. (*Id.* ¶ 23.)

The Union also conducted its own investigation. (*Id.* ¶ 24.) As part of that investigation, Nicosia spoke with Laura Heller, Harmon's co-worker. (*Id.* ¶ 25.) Heller told Nicosia that she did not hear Griffith make the racial comment and that she did not believe Griffith was treating Harmon differently than her co-workers. (*Id.* ¶ 26.) Also, Seib spoke with Amber Walczak, a co-worker who, according to Harmon, overheard Griffith make the racial comment. (*Id.* ¶ 27.) Walczak told Seib that she did not hear Griffith make the racial comment and that she did not believe Griffith was treating Harmon differently than her co-workers. (*Id.* ¶ 28.) Finally, Seib spoke with Griffith. (*Id.* ¶ 29.) Griffith denied making the racial comment and suggested that Harmon misinterpreted something she said. Griffith also denied treating Harmon differently than her co-workers and claimed to treat everyone equally. The Union declined to file a grievance related to Harmon's complaints about Griffith because, in its view, the investigation did not corroborate Harmon's allegations, Harmon had not alleged that WRTP disciplined her or threatened her employment, and WRTP appeared to take Harmon's allegations extremely seriously. (*Id.* ¶ 30.)

### 3. The January 27 Discipline

During a meeting attended by Harmon and Nicosia on or about January 27, 2017, WRTP issued Harmon a verbal and written warning (the "January 27 Discipline") for allegedly ignoring and refusing to comply with Griffith's verbal instructions, continually asking other staff and Griffith to send her priorities via email, and exhibiting a poor attitude.

(*Id.* ¶¶ 31–32; Exhibit 4 to Deposition of Lisa Harmon, Docket # 42-3.) Thereafter, Harmon refused Nicosia's request to meet with him to discuss WRTP's accusations. (DPFOF ¶ 33.)

Notwithstanding Harmon's lack of cooperation, the Union investigated the allegations contained in the January 27 Discipline. (*Id.* ¶ 34.) Harmon's co-workers (and fellow union members) John Anderson, Heller, and Walczak each told Union Committeepersons that Harmon had, in fact, interrupted staff, Heller, and Griffith during a recruitment session wanting written directions on what tasks she should be working on, even though a timeline and tasks were given, as WRTP alleged in the January 27 Discipline. (*Id.* ¶ 35.) Additionally, Walczak told Seib that Harmon had been loud and disruptive during a testing session. (*Id.* ¶ 36.) And Walczak and Heller told Ashley and Nicosia that Harmon insisted that directives and priorities be placed in writing. (*Id.* ¶ 37.) Moreover, Ashley had personally witnessed several of the events described in the January 27 Discipline. (*Id.* ¶¶ 38–39.)

On or about February 8, 2017, the Union filed a grievance concerning the January 27 Discipline. (*Id.* ¶ 42; Exhibit 5 to Harmon Dep., Docket # 42-4.) During a meeting two weeks later, the Union argued that WRTP was not justified in disciplining Harmon for requesting written approval prior to leaving the office, as alleged in the January 27 Discipline. (DPFOF ¶¶ 42–43.) In response, WRTP offered to reduce the January 27 Discipline to a verbal warning only; the Union accepted. (*Id.* ¶ 43.) Seib and Ashley informed Harmon of the reduced discipline and that the Union considered the matter resolved. (*Id.* ¶ 44.)

### 4. *The February 24 Warning*

During a meeting attended by Seib, Ashley, and Harmon on February 24, 2017, WRTP issued Harmon a written warning (the "February 24 Warning") for allegedly

(1) deliberately ignoring and refusing to respond to email and verbal directions from Griffith about enrolling individuals from the Roadbuilding/Streetcar training class in WIOA, and (2) failing to provide information needed for a presentation by the required deadline. (*Id.* ¶¶ 48, 50–54; Exhibit 8 to Harmon Dep., Docket # 42-5.) When the Union attempted to discuss the allegations contained in the warning, Harmon indicated that she intended to get a lawyer and that she did not have anything more to say to the Union. (DPFOF ¶ 49.) Following an investigation, the Union concluded that the allegation about Harmon not responding to Griffith was partially accurate: it appeared Harmon had enrolled the participants, but she did not timely respond to Griffith's requests for updates. (*Id.* ¶ 55.) As to the other allegation, Harmon acknowledged that she did not provide the information needed for the presentation. (*Id.* ¶¶ 56–58.) The Union filed a grievance concerning the February 24 Warning on March 15, 2017. (*Id.* ¶ 83; Exhibit 14 to Harmon Dep., Docket # 42-10.)

     5.    *Union's efforts to discuss January 27 Discipline and February 24 Warning with Harmon*

On or about February 28, 2017, O'Connor, Seib, and Ashley met to discuss the discipline WRTP issued to Harmon on January 27 and February 24. (*Id.* ¶ 59.) At the close of the meeting, O'Connor asked Seib to tell Harmon that he wanted to meet with her directly to more fully understand her responses to WRTP's allegations. (*Id.* ¶ 60.) A few days later, Seib met with Harmon to review her concerns with the February 24 Warning. (*Id.* ¶ 61.) Seib told Harmon that O'Connor wanted to meet with her directly. (*Id.* ¶ 62.) Harmon responded that she did not want to meet with O'Connor and that instead she was looking into securing legal representation. (*Id.* ¶ 63.) Seib passed this information along to O'Connor the following day. (*Id.* ¶ 64.) Seib also told O'Connor that she was frustrated with Harmon's refusals to

cooperate and that she was growing concerned that Harmon was adversely affecting other employees and union members. (*Id.* ¶¶ 65–66.)

6. *The March 10 Warning and Final Warning*

On Thursday, January 12, 2017, Harmon left work early. (Exhibit K to PPFOF, Docket # 52-1 at 130.) She took an unpaid day off on Friday, Monday was a paid federal holiday, and Harmon took another unpaid day off on Tuesday. These absences were approved by WRTP. The following month, Harmon used sick/personal days to take off work from February 14, 2017, through February 17, 2017. (*Id.* at 130–31.) Harmon provided a doctor's excuse for her absences on February 15, 16, and 17. (*See id.* at 128–29; *see also* Exhibit Y to PPFOF, Docket # 52-1 at 193.)

When Harmon returned to work on February 20, 2017, WRTP requested her to provide a written description of the medical condition that required her to be off work. (*See* Exhibit 15 to Harmon Dep., Docket # 42-11.) WRTP reiterated its request twice the following day. In response, Harmon gave WRTP a letter from her doctor's clinic dated February 22, 2017, indicating that federal privacy laws prohibited providing employers a reason for a work release unless the visit was related to worker's compensation. (*See* PPFOF Ex. K, Docket # 52-1 at 126.) The letter further stated, "If there is a legal reason for the employer to be demanding any private medical information[,] they should notify the clinic in writing of the request." (*Id.*) On March 2, 2017, WRTP asked Harmon to sign a release for her medical records and advised that failure to comply by the following day would result in discipline. (Harmon Dep. Ex. 15.) Harmon did not sign the release or provide WRTP a written

description of the medical condition that required her absence from work. (*See* Harmon Dep. at 155:7–15, Docket # 42-1.)

During a meeting attended by Seib and Harmon on March 10, 2017, WRTP issued Harmon a written warning (the "March 10 Warning") for "[p]ossible misuse of personal time," alleging that she had "missed four consecutive days on two occurrences in a 30-day period." (DPFOF ¶¶ 70, 72; Harmon Dep. Ex. 15.) The warning also noted that Harmon was asked on multiple occasions to provide a written description of the medical condition that led to the February absences and was given a medical release. In the same meeting, WRTP issued Harmon a final written warning (the "Final Warning") for allegedly failing to perform assigned work. (DPFOF ¶ 71; Exhibit 17 to Harmon Dep., Docket # 42-12.)

On or about March 15, 2015, O'Connor, Ashley, Nicosia, and Seib met with WRTP to discuss the March 10 Warning and the Final Warning. (DPFOF ¶ 73.) During the meeting, Waltz and Kessenich expressed concerns about Harmon's behavior and work performance. (*Id.* ¶¶ 74–76.) In response, the Union asked WRTP to explain its reasons for disciplining Harmon, asked WRTP to describe Harmon's role, objected that WRTP appeared to be "piling on" Harmon by issuing several disciplinary notices in a short period of time, and expressed concern that the severity of the discipline did not fit the severity of the accusations. (*Id.* ¶ 77.) At the conclusion of the meeting, O'Connor asked the Committeepersons to let Harmon know that he wanted to meet with her directly to better understand her response to the discipline she received. (*Id.* ¶ 78.)

That evening, Seib informed Harmon via email that, before the Union could help her, O'Connor needed to talk to her about the discipline she received and the grievances filed on her behalf. (Exhibit 37 to Harmon Dep., Docket # 42-22.) Harmon responded that Seib,

9

Nicosia, and Ashley should talk to O'Connor, as they all had notes about what was going on.

Seib explained that it was in Harmon's best interest to meet with O'Connor so that the Union

could better represent her. Harmon replied,

> I feel as though I am being forced to meet with him. You, Joe, and Kyle have
> been in the disciplinary meeting that I had with management and you have all
> taken notes and can inform Mr. Patrick on what's [sic] has taken place. I would
> just like to complete my work in which I have a lot to do.

(*Id.*) Notwithstanding Harmon's refusal to meet with O'Connor, on March 15, 2017, the

Union filed a grievance concerning the March 10 Warning and the Final Warning. (DPFOF

¶ 83; Harmon Dep. Ex. 14.)

### 7.    The March 16 Termination

At the request of one of WRTP's partner agencies, Employ Milwaukee, on March 16,

2017, Waltz asked Harmon to transfer participants in the dislocated workers' program to

WIOA adult career coach. (Harmon Dep. at 179:1–181:17.) Later that day, Harmon emailed

Waltz, stating that she had previously been informed that participants could not be enrolled

in both programs at the same time. (Exhibit 24 to Harmon Dep., Docket # 42-16.) Harmon

indicated that if Employ Milwaukee had changed its process, then she wanted a copy of that

change in writing. Before hearing back from Waltz, Harmon called the case manager for

Employ Milwaukee to confirm that she was processing participants correctly. (Harmon Dep.

at 182:17–183:7.)

That afternoon, Waltz informed Nicosia that WRTP had decided to terminate

Harmon's employment. (DPFOF ¶ 90.) Nicosia asked Waltz to wait to terminate Harmon

until he had an opportunity to speak with her, but Waltz refused. (*Id.* ¶ 91.) At about 4:30

p.m., Waltz, Seib, Nicosia, and Ashley entered Harmon's office. (*See* PRDPFOF ¶ 92.) Waltz

gave Harmon a termination letter (the "March 16 Termination"), which indicated that she was fired, effective immediately, "[d]ue to [her] continued progressive disciplinary violations, inability to fulfill the duties of the Construction Training Program Case Manager as is laid out in the position description, and continued insubordination." (Exhibit 4 to Declaration of Candace Seib, Docket # 45-4.)

O'Connor wrote Harmon a letter, dated March 22, 2017, stating that he did not believe her discipline was justified. (Exhibit 30 to Harmon Dep., Docket # 42-19.) The letter noted, however, that the Union's attempts to meet with her to discuss the validity of WRTP's allegations had been unsuccessful. O'Connor explained that a proper investigation would be impossible without Harmon's input and cooperation. Thereafter, Harmon agreed to meet with the Union on March 28, 2017. (DPFOF ¶ 100.)

On March 28, Harmon—accompanied by two of her cousins—met with O'Connor, Seib, Ashley, and Nicosia. (*Id.* ¶¶ 101–02; *see* Affidavit of Sherry Walker, Docket # 52-1 at 1.) When O'Connor asked about WRTP's allegations concerning enrollment of the Roadbuilding/Streetcar training class (i.e., part of the February 24 Warning), Harmon did not respond directly and instead directed O'Connor to review the notes she allegedly gave to Seib. (DPFOF ¶ 103.) Eventually, O'Connor ended the meeting and told Harmon that the two would meet later. (DPFOF ¶ 105.) In anticipation of that follow-up meeting, O'Connor asked Harmon to prepare written responses to WRTP's allegations, and she did. (DPFOF ¶ 107; Exhibit 32 to Harmon Dep., Docket # 42-20.) O'Connor and Harmon met again on April 13, 2017. (DPFOF ¶ 106.)

On or about April 11, 2017, the Union filed a grievance concerning Harmon's termination and requested that she be reinstated and made whole. (DPFOF ¶ 95; Exhibit 5 to

Seib Decl., Docket # 45-5.) After meeting with the Union to discuss Harmon's termination, on April 19, 2017, WRTP denied the grievance, indicating that its "position has not changed[,] . . . and we feel that the termination was justified." (Exhibit 6 to Seib Decl., Docket # 45-6.)

8.      *The Union's investigation*

On or about April 17, 2017, the Union and WRTP met to discuss the Union's grievances of the March 10 Warning, the Final Warning, and the March 16 Termination. (DPFOF ¶ 108.) Present for the meeting were Waltz, Kessenich, Griffith, O'Connor, Seib, Ashley, and Nicosia. (*Id.* ¶ 109.) During the meeting, O'Connor questioned why WRTP had not recognized Harmon's alleged struggles right away and the propriety of the March 10 Warning regarding Harmon's alleged refusal to disclose the medical condition that necessitated time off work. (*Id.* ¶ 110.) WRTP claimed that it decided to terminate Harmon because she was unable to keep up with the demands of her position, she was not catching on as WRTP expected she would, and Harmon's inability to perform her job duties in a timely manner damaged WRTP's relationships with its partner agencies, including Employ Milwaukee. (*Id.* ¶ 111.) WRTP also claimed that Harmon created a "toxic environment" wherein other employees complained about having to work with her. (*Id.* ¶ 112.) On May 10, 2017, the Union informed WRTP that it intended to arbitrate the March 16 Termination. (*Id.* ¶ 113.)

Following the April 17 meeting, the Union verbally requested information from WRTP related to its decision to terminate Harmon. (*Id.* ¶ 114.) On June 14, 2017, WRTP produced four documents, which showed that Ronny Yang—the co-worker who took over

Harmon's tasks following her termination—significantly outperformed Harmon. (*Id.* ¶¶ 115–18; Exhibit 7 to Seib Decl., Docket # 45-7.) The Union also reviewed other materials related to Harmon's grievances, including: (1) information related to WRTP's voucher processes; (2) information related to WRTP's WIOA enrollment processes; (3) Harmon's resume; (4) information and things related to WRTP's "TABE" testing procedures; (5) information and things related to "OWRA"; (6) examples of Individual Employment Plans ("IEPs"); (7) each of the disciplinary notices supplied to Harmon, and the Union's grievances of them ; (8) the Agreement; (9) multiple emails and other communications sent or received by Harmon; and (10) notes, memoranda, and other documents and things related to Committeeperson's efforts to investigate WRTP's disciplines issued to Harmon and WRTP's decision to terminate Harmon. (DPFOF ¶ 119.)

On August 23, 2017, O'Connor and Harmon met again to review the grieved disciplinary notices and termination. (*Id.* ¶ 120.) At the meeting, O'Connor described WRTP's data comparing Harmon's and Yang's performance and the Union's own findings related to WRTP's reasons for disciplining and terminating Harmon. (*Id.* ¶ 121.) Thereafter, the Union continued its own investigation into WRTP's allegations. (*See id.* ¶¶ 123–33.) The following month, O'Connor informed Harmon that the Union had been advised by its lawyer to wait until the EEOC made a decision on her discrimination complaint. (Exhibit W to PPFOF, Docket # 52-1 at 176–77.) In response, Harmon requested the lawyer's contact information and a copy of her grievance. (*Id.* at 178.) On November 8, 2017, O'Connor informed Harmon that the Union would not be pursuing arbitration with respect to her grievances, writing:

> Throughout the grievance process and subsequent investigation, the Union met with company representatives on several occasions, requested additional data to substantiate the progressive discipline you received which ultimately led to your termination and conducted multiple interviews including yourself.
>
> Following a thorough review of the facts surrounding this investigation, including the dismissal of your EEOC complaint, the Union has determined that we will not be pursuing arbitration on this matter.

(DPFOF ¶ 134; Exhibit 12 to Declaration of Patrick O'Connor, Docket # 44-12.) Harmon disagreed with the Union's decision. (PPFOF Ex. W, Docket # 52-1 at 175.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. *Id.* at 247–48. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence that would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 322–24. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive

summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (quoting *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003)).

## ANALYSIS

Harmon alleges in her Amended Complaint that the Union breached its duty of fair representation and failed to follow the Agreement between WRTP and the Union. The Union moves for summary judgment on Harmon's claims, arguing that her claims related to the January 2017 Complaints and the January 27 Discipline are time-barred and that no reasonable jury could find that the Union breached its duty of fair representation.

     *1.     Whether Harmon timely filed her claims relating to the January 2017 Complaints and the January 27 Discipline*

The statute of limitations for a fair-representation claim is six months. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169 (1983). The six-month limitations period begins to run when "a final decision on a plaintiff's grievance has been made or from the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that no further action would be taken on [her] grievance." *Chapple v. Nat'l Starch & Chem. Co.*, 178 F.3d 501, 505 (7th Cir. 1999) (quoting *Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir. 1986)). "[W]hen a collective bargaining agreement requires that all grievances be brought within a certain period, 'under the [language] of the collective bargaining agreement, the failure and refusal of the Union to file the grievance within the

specified time amounted to a final decision.'" *Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 914 (7th Cir. 1999) (quoting *Metz v. Tootsie Roll Indus., Inc.*, 715 F.2d 299, 303 (7th Cir. 1983)).

Here, the Agreement established a four-step, sequential grievance procedure:

A. The issue shall be taken up by the employee, Committeeperson(s) and the employer.

B. If no satisfactory settlement is reached, the Committee shall call in a representative of the Union who shall meet with the employer.

C. If no satisfactory settlement is reached, the grievance shall be reduced to writing with a written response. The grieving party (Union or employer) has the right to submit the grievance to arbitration.

D. The grieving party shall request a panel from the Federal Mediation and Conciliation Service. Alternate method of deletion will be used to select an arbitrator. The cost of arbitration shall be shared equally by the Union and employer.

(Exhibit 1 to O'Connor Decl., § 17.2, Docket # 44-1.) The Agreement indicates that a written grievance must be filed within five days of the meeting with management; management then has ten days to respond to the grievance. (*See id.* § 17.4.) Requests for arbitration must be filed within thirty days "after initial filing of grievance with business agent." (*See id.*)

Harmon's claim relating to her January 2017 Complaints is untimely. The undisputed facts show that the Union, through O'Connor, met with WRTP on January 11, 2017, to discuss Harmon's complaints against Griffith. (DPFOF ¶ 22.) Thus, according to the Agreement, the Union had until January 16, 2017, to file a written grievance on Harmon's behalf. The Union did not file a grievance by that deadline. This inaction constituted the Union's "final decision" on Harmon's grievance relating to her allegations against Griffith, thus starting the six-month limitations clock. *See Metz*, 715 F.2d at 304 (holding that union's failure and refusal to take any action on employee's grievance constitutes a final decision

16

triggering the limitations clock). To be timely, Harmon had to file her claim against the Union by July 16, 2017 (i.e., six months after January 16). It was not. Harmon first filed suit against WRTP and the Union on December 19, 2017. *See Harmon v. Wis. Reg'l Training P'ship*, Case No. 2:17-cv-01762-NJ (E.D. Wis.).[1]

The fact that the Union did not directly inform Harmon it failed to file a grievance regarding the January 2017 Complaints, (*see* PRDPFOF ¶ 30), is not a bar to accrual. Harmon's main claim here is that the Union failed to grieve her complaints about Griffith. (*See* Am. Compl. at 2; Plaintiff's Brief in Opposition at 5–6, Docket # 49.) Thus, she should reasonably have become aware of the Union's decision not to file a grievance before June 19, 2017—that is, six months prior to the initiation of the original action against the Union. *See Christiansen*, 178 F.3d at 915 (finding plaintiff's failure-to-represent claim untimely in part because plaintiff admitted she realized more than six months before initiating the action that the union had not filed a grievance on her behalf).

Harmon's claim relating to the January 27 Discipline is also untimely. Harmon received the verbal and written warning during a meeting she attended with Nicosia, one of the Union's Committeepersons at WRTP. (DPFOF ¶¶ 31–32.) After investigating WRTP's allegations, the Union filed a written grievance on Harmon's behalf, (*id.* ¶ 42; Harmon Dep. Ex. 5), and subsequently accepted WRTP's offer to reduce the January 27 Discipline to a verbal warning only, (DPFOF ¶¶ 42–43). On February 22, 2017, Seib and Ashley informed Harmon of the reduced discipline and that the Union considered the matter resolved. (*Id.*

---

[1] Judge Jones, who was originally assigned to that case, directed Harmon to split the suit into two: one against WRTP and one against the Union. Harmon did, filing a separate case against the Union (i.e., this one) on January 16, 2018. (*See* Complaint, Docket # 1.)

¶ 44.) Although Harmon asserts that she told the Union she wanted the January 27 Discipline off her record entirely, (PRDPFOF ¶ 44), the Union explicitly told her that it would be taking no further action on her grievance. Thus, to be timely, Harmon had to file her claim against the Union by August 22, 2017 (i.e., six months after February 22). It was not.

Accordingly, Harmon's claims relating to the January 2017 Complaints and the January 27 Discipline are time-barred and must be dismissed.

<em>2.	Whether the Union is entitled to summary judgment on the merits of Harmon's claims</em>

"A union is the 'exclusive bargaining representative' for its members and, as such, has a duty 'fairly to represent' all of them, 'both in its collective bargaining with [an employer] and in its enforcement of the resulting collective bargaining agreement.' " *Rupcich v. United Food & Commercial Workers Int'l Union, Local 881*, 833 F.3d 847, 853 (7th Cir. 2016) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). When a union representing an employee in a grievance procedure acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion," the employee may sue the union "for breach of [its] duty of fair representation, which is implied under the scheme of the National Labor Relations Act." *See DelCostello*, 462 U.S. at 163–65 (citations omitted). To prevail against the union, the plaintiff must show that (1) the employer violated the collective bargaining agreement, and (2) the Union breached its duty to fairly represent the employee in the grievance process. *Rupcich*, 833 F.3d at 853 (citing *DelCostello*, 462 U.S. at 164–65). Failure to prove either element is fatal. *Rupcich*, 833 F.3d at 853 (citing *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)).

"A union breaches its duty of fair representation if its conduct is arbitrary, discriminatory, or in bad faith." *Matthews v. Milwaukee Area Local Postal Workers Union, AFL-*

*CIO*, 495 F.3d 438, 441 (7th Cir. 2007) (citing *Vaca*, 386 U.S. at 190; *McKelvin v. E.J. Brach Corp.*, 124 F.3d 864, 867 (7th Cir. 1997)). On review, courts "should look to each standard separately when determining whether a union violated its duty." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (citing *Griffin v. Air Line Pilots Assoc.*, 32 F.3d 1079, 1083 (7th Cir. 1994); *Rakestraw v. United Airlines*, 989 F.2d 944, 945 (7th Cir. 1993)). Harmon argues that the Union's actions were arbitrary and in bad faith, but not discriminatory. To survive summary judgment, she must "proffer evidence supporting at least one of these elements." *Rupcich*, 833 F.3d at 854 (quoting *Filippo v. N. Ind. Pub. Serv. Corp.*, 141 F.3d 744, 749 (7th Cir. 1998)).

### 2.1  Arbitrary

Under the arbitrary prong, the plaintiff's burden on summary judgment is to show: (1) that the union acted arbitrarily—that is, "that the union's position could eventually be deemed not even colorable," *Rupcich*, 833 F.3d at 854 (quoting *McKelvin*, 124 F.3d at 868); and (2) that "the outcome . . . would probably have been different but for the union's activities," *Rupcich*, 833 F.3d at 854 (quoting *Garcia*, 58 F.3d at 1177). "Determining whether a union's actions are arbitrary under this standard requires 'an objective inquiry.'" *Rupcich*, 833 F.3d at 854 (citing *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003)). "In applying this extremely deferential standard, [reviewing courts] will 'not substitute [their] judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.'" *McKelvin*, 124 F.3d at 867 (quoting *Garcia*, 58 F.3d at 1176). "[A] 'union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of

reasonableness, as to be irrational.'" *Rupcich*, 833 F.3d at 854 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).

Harmon contends that the Union acted arbitrarily by (1) failing to file a grievance concerning the January 2017 Complaints, (2) failing to provide the EEOC with crucial information, (3) not following through with its promised apology from Griffith, and (4) doing nothing to stop WRTP's harassment and retaliation. (Pl.'s Br. at 5–6, 9–10.)[2]

No reasonable jury could find in favor of Harmon on her claims relating to the January 2017 Complaints. First, even if these claims had been timely, Harmon has failed to present sufficient evidence from which a jury could find that the Union acted arbitrarily in not filing a grievance concerning the alleged discriminatory treatment by Griffith. Harmon has not presented any evidence to dispute the Union's claim that it spoke with several witnesses and was unable to corroborate Harmon's allegations. For example, she claims, without any evidentiary support, that Walczak heard Griffith make the racial comments and that Griffith treated her differently than her white co-workers. (*See* PRDPFOF ¶¶ 24–29.) The Union therefore reasonably concluded that pursuing a grievance on this issue would have been futile. *See Ooley v. Schwitzer Div., Household Mfg., Inc.*, 961 F.2d 1293, 1304 (7th Cir. 1992) ("[A]n employee cannot prevail on a fair representation claim based on the union's failure to process a grievance if the employee's claim lacks merit.").

Second, Harmon's claim that the Union failed to provide the EEOC with crucial information during its investigation lacks support in the record. Seib (presuming it is her on the tapes Harmon secretly recorded) explicitly denied telling Harmon that others had

---

[2] Harmon does not argue that the Union acted arbitrarily with respect to the January 27 Discipline, the February 24 Warning, the March 10 Warning, the Final Warning, or the March 16 Termination.

complained about Griffith making inappropriate racial remarks. (*See* PPFOF Ex. 1, Audio Tape #1 at 45:25–49:25; PPFOF Ex. H, Docket # 52-1 at 112.) Rather, Seib stated she thought she heard from someone that "many, many years ago" Griffith made "some kind a racial comment." (*Id.*) Given the uncertainty and vagueness of Seib's recollection, no reasonable jury could find that the Union acted irrationally in failing to pass this information along to the EEOC.[3] Moreover, Harmon has failed to explain how the outcome of her discrimination complaint, let alone a potential grievance against WRTP, would have been different if the Union had provided the EEOC this information.

Third, Harmon has not provided any evidentiary support for her claim that the Union promised her a written apology concerning Griffith's behavior. Seib told Harmon that WRTP offered to have Griffith send Harmon an apology letter but Seib declined, insisting that Griffith apologize in person. (*See* PPFOF Ex. 1, Audio Tape #3 at 104:35–106:10; PPFOF Ex. H, Docket # 52-1 at 112.) As such, the Union did not act arbitrarily in failing to pursue a meritless grievance.

Finally, no reasonable jury could find that the Union acted arbitrarily in response to Harmon's complaints about harassment and retaliation. Harmon provides no support for her claim that the Union knew WRTP was retaliating against her for filing a complaint about Griffith. While Harmon repeatedly told her Committeepersons that she felt she was being retaliated against, Seib and Ashley both indicated that they did not think management was trying to get rid of her. (*See* PPFOF Ex. 1, Audio Tape #3 at 56:30–58:40; PPFOF Ex. H, Docket # 52-1 at 112.) Likewise, Ashley merely acknowledged to Harmon that it was

---

[3] The Union also denied having knowledge of Griffith making any racial remarks or comments. (*See* Exhibit 7 to PPFOF, Docket # 52-1 at 43–44.)

unrealistic for her to think everything would stay the same after she filed her complaint against Griffith; he did not agree with any of her specific allegations of harassment or retaliation. (*See* PPFOF Ex. 1, Audio Tape #5 at 114:10–117:06; PPFOF Ex. H, Docket # 52-1 at 113.)

Even if the Union did know about the retaliation, Harmon has not presented sufficient evidence from which a reasonable jury could find that the Union's handling of her allegations was irrational. It is undisputed that the Union attended disciplinary meetings with Harmon; grieved every disciplinary action WRTP issued to Harmon; investigated WRTP's allegations, including meeting with Harmon, interviewing witnesses, and reviewing evidence; negotiated a settlement of one grievance; and objected to some of the discipline Harmon received, including her termination. (*See* DPFOF ¶¶ 17–20, 24–39, 42–43, 48–58, 70–78, 83, 90–92, 95, 100–03, 106–10, 114, 119–21, 123–33.) Thus, Harmon's claim that the Union "did nothing" to help her is not supported by the record. And Harmon's brief is largely silent on specific alleged missteps by the Union and what she believes the Union should have done differently.

Accordingly, no reasonable jury could find in Harmon's favor under the arbitrary prong of her fair-representation claim.

### 2.2 Bad faith

Determining "[w]hether or not a union's actions are . . . in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Rupcich*, 833 F.3d at 859 (quoting *Neal*, 349 F.3d at 369). To survive summary judgment, the plaintiff "must identify conduct by Union officials that would support a reasonable inference of bad faith." *Konen v. Int'l Bhd. of Teamsters, Local 200*, 255 F.3d 402, 408 (7th Cir. 2001) (citing *Crider*, 130 F.3d at 1343). Harmon contends that the Union was dishonest and acted in bad faith in eight different respects.

Harmon first asserts that Seib falsely denied telling Harmon on January 9, 2017, that others had complained about Griffith and that Harmon asked to talk to the Union's lawyer during a meeting on February 20, 2017. (Pl.'s Br. at 6.) Neither assertion is supported by evidence of a type that would be admissible at trial. Harmon insists that she quoted Seib's exact words about Griffith, but she provides no evidence to support this claim. As to the lawyer comment, Harmon cites a note she allegedly took the day of the alleged meeting. (*See* Exhibit Z to PPFOF, Docket # 52-2 at 17.) Harmon has failed to proffer how the note would be admissible. Even if she had, this alleged isolated lie is insufficient to establish bad faith on the part of the Union.

Harmon also asserts that the Union acted dishonestly because, prior to her grievances, WRTP and the Union had the same lawyer. (Pl.'s Br. at 7.) O'Connor did tell Harmon that WRTP and the Union used the same law firm. (*See* PPFOF Ex.1, Tape 11 at 54:30–100:05; PPFOF Ex. H, Docket #52-1 at 116.) But he explained that, if the matter moved past the investigation phase, the firm would not represent either entity due to the conflict of interest. (*Id.*) O'Connor expressly disclaimed sharing confidential information with WRTP, and Harmon presents only speculation that the Union did. (*Id.*) Moreover, Harmon does not allege that the Union obstructed her from seeking a private lawyer. *See, e.g.*, *Garcia*, 58 F.3d at 1179–81. Indeed, Harmon told the Union that she was going to get her own lawyer. (*See* DPFOF ¶¶ 49, 63.) Harmon has failed to demonstrate that the Union acted in bad faith when it used the same law firm as WRTP prior to Harmon's grievances but did not use that firm in processing her grievances.

Next, Harmon asserts that the Union failed to fully and thoroughly investigate her grievances. (Pl.'s Br. at 7.) This assertion is completely undeveloped and, for the reasons explained above, unsupported by the record.

Harmon further asserts that the Union breached the Agreement by not following the steps and timeline of the grievance procedure. (Pl.'s Br. at 7–9.) Specifically, she maintains that the Union did not follow the first step (Step A), which mandates that the employee, management, and the Union work to try to resolve the matter. (*See* O'Connor Decl. Ex. 1, §§ 17.2, 17.4.) However, the evidence Harmon cites does not support her argument. (*See* PPFOF ¶¶ 54–55.) Harmon also does not indicate which grievance she is referring to. The Agreement indicates that "discharge grievances may be initiated . . . directly at Step B," the second step. (O'Connor Decl. Ex. 1, § 17.3.) And the undisputed facts show that Harmon did meet with WRTP and the Union at times to discuss her grievances, (*see* DPFOF ¶¶ 18–19), but other times she refused or was unable to meet, (*see id.* ¶¶ 33, 48–49, 62–63; Harmon Dep. Ex. 37; PPFOF Ex. 1, Audio Tape #11 at 4:10–4:40; PPFOF Ex. H, Docket # 52-1 at 116). Crucially, Harmon fails to explain how she was harmed by the alleged failure to follow the first step of the grievance procedure. It is undisputed that the Union grieved every discipline Harmon received (including her termination) and that the Union attempted to resolve those grievances with management. WRTP never objected to the timeliness of those grievances, and Harmon was given ample opportunity to participate in the process.

Harmon asserts that the Union acted in bad faith because it failed to provide declaration statements or other documentation to substantiate its interviews with certain WRTP employees, including Walczak, Heller, Griffith, Anderson, and Otis Dunning. (Pl.'s Br. at 8.) The Union did, however, submit declarations from the Union's Committeepersons

who claimed to have spoken with those witnesses and who described those witnesses' statements. (*See* DPFOF ¶¶ 25–29, 35–37, 40–41.) Harmon has not presented any evidence to show that the Union did not in fact meet with those witnesses or that the Union acted in bad faith in accepting their statements as true.

Next, Harmon asserts that the Union failed to interview other staff who had information relevant to her grievances. (Pl.'s Br. at 8.) She identifies several individuals in her proposed findings of fact—Anna Mullikin, Carrie Hersh, Nanette Smith, Gloria Tate, and Chytania Brown—but never explains what those witnesses would have said or how their interviews would have changed the outcome of the investigation. *See Kline v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 141*, 164 F. Supp. 3d 1066, 1070 (N.D. Ill. 2016) (citing *Garcia*, 58 F.3d at 1176–77 (holding that a union's failure to present favorable evidence breaches the duty of fair representation only if the evidence probably would have brought about a different decision).)

Harmon also asserts that the Union acted in bad faith by having its Committeepersons, rather than O'Connor, write her grievances. (Pl.'s Br. at 8–9.) However, she does not allege any specific deficiencies with the grievances as written. Harmon therefore has failed to show that the outcome of her grievances would have been different if O'Connor had written them himself.

Finally, Harmon asserts that the Union did not respond to her request for its lawyer's contact information. (Pl.'s Br. at 9.) In support of this assertion, Harmon cites emails she sent to O'Connor in September 2017, asking for the name and phone number of the Union's lawyer. (PPFOF Ex. W, Docket # 52-1 at 178.) The email chain submitted by Harmon does not that show that O'Connor provided the requested information. (*See id.* at 173–78.) As with

many others, this argument is undeveloped. Harmon does not explain how she was harmed by the Union's alleged failure to provide her its lawyer's contact information.

In sum, Harmon has not offered any evidence that the Union acted in bad faith. She does not point to any ulterior motive by the Union and has not identified any conduct that would support a reasonable inference of dishonesty in its representation. For example, Harmon has not shown attempts by the Union and WRTP to conceal an agreement to stymie her grievances, *see Rupcich*, 833 F.3d at 859, or that the Union declined to pursue a meritorious grievance for strategic reasons, *see Ooley*, 961 F.2d at 1303–04. The record shows that the Union grieved each discipline Harmon received, conducted its own investigation, and determined that it would not succeed at arbitration. Harmon has not offered evidence that the Union had an ulterior motive in its representation of her. Accordingly, no reasonable jury could find in Harmon's favor under the bad-faith prong of her fair-representation claim.

## CONCLUSION

The Seventh Circuit has stated that summary judgment is the "put up or shut up" moment in a lawsuit. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). While Harmon argues that the Union breached its duty of fair representation, several of her claims are untimely, and Harmon fails to put forward any evidence on which a rational trier of fact could find in her favor on the others. Because the undisputed facts fail to show that the Union acted arbitrarily, discriminatorily, or in bad faith in representing Harmon, the Union fulfilled its

duty of fair representation as a matter of law.[4] For these reasons, the Union's motion for summary judgment is granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Union's motion for summary judgment (Docket # 39) is **GRANTED**.

**IT IS FURTHER ORDERED** that the clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of February, 2020.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

---

[4] Because Harmon does not have an actionable claim against the Union for a breach of the duty of fair representation, I do not need to address whether she would also be able to prove that WRTP breached the Agreement. *See Rupcich*, 833 F.3d at 853, 859–60.